**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOAN PRESTON,** | **CIVIL ACTION** |
| Plaintiff, | **NO. 14-07243** |
| **v.** | |
| **THE VANGUARD GROUP, INC.,** | |
| Defendant. | |

**PAPPERT, J.**                                          **NOVEMBER 30, 2015**

## MEMORANDUM

Plaintiff Joan Preston ("Preston") sued her former employer, The Vanguard Group, Inc. ("Vanguard"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), 42 U.S.C. § 1981, and the Pennsylvania Human Relations Act ("PHRA"). Before the Court are two motions: (1) Vanguard's Motion for Summary Judgment; and (2) Preston's Motion for Leave to Amend her Complaint. For the reasons that follow, Vanguard's motion is granted and Preston's motion is denied.

## I.

In 2000, Preston began working for Vanguard as a Processing Clerk. (Defendant's Statement of Material Facts ("Def.'s SMF") ¶ 1; Pl.'s Response to Defendant's Statement of Material Facts ("Pl.'s SMF") ¶ 1; Preston Dep. 32:16–21.) Sometime in 2007, Preston became a sales support specialist in the asset management services department. (Def.'s SMF ¶ 1; Pl.'s SMF ¶ 1; Preston Dep. 35:12–36:9.) In that role, Preston reviewed sales leads and assigned those leads to the correct sales representative. (Defendant's Motion for Summary Judgment ("Def.'s Mot. Summ. J.") at Ex. 23, ECF No. 24.) Additionally, Preston assembled client

presentations for sales representatives, filed paperwork, and assembled packets of information. (Def.'s SMF ¶ 2; Pl.'s SMF ¶ 2; Fisher Dep. 12:20–13:4; 25:8–20.)

From October 2007 to May 2011, Preston's supervisor was Seth Fisher ("Fisher"). (Def.'s SMF ¶ 3; Pl.'s SMF ¶ 3; Fisher Dep. 9:2–7.)  Brian Hamill ("Hamill") then took over as Preston's supervisor and remained in that position until the end of 2011.  (Def.'s SMF ¶ 3; Pl.'s SMF ¶ 3; Fisher Dep. 78:4–11.)  While supervised by Fisher and Hamill, Preston worked with three other sales support specialists: Jennifer Book ("Book"), Jennifer Wagner ("Wagner") and Jennifer Rutledge ("Rutledge").  (Def.'s SMF ¶ 4; Pl.'s SMF ¶ 4; Fisher Dep. 39:11–21.) Neither Book, Rutledge nor Wagner was Preston's supervisor: they did not oversee Preston's work; they could not discharge her, discipline her or rate her performance.  (Def.'s SMF ¶ 4; Pl.'s SMF ¶ 4; Bailey Dep. 117:14–118:16.)

In May 2010, Preston complained to Fisher that Book, Rutledge and Wagner were moving things on her desk.  (Def.'s SMF ¶ 5; Pl.'s SMF ¶ 5; Fisher Dep. 41:8–43:9; 59:1–7.) However, Preston admits that she never saw anyone actually doing so.  (Def.'s SMF ¶ 6; Pl.'s SMF ¶ 6; Preston Dep. 465:17–21; 469:17–470:7; 472:1–480:14.)  In response to Preston's complaint, Fisher contacted Nina Mattson-Thomas ("Mattson-Thomas") in Vanguard's Crew Relations Team.  (Def.'s SMF ¶ 7; Pl.'s SMF ¶ 7; Fisher Dep. 43:10–44:16.)  Mattson-Thomas met with Preston on May 6, 2010, but Preston did not want to address the issue.  (Def.'s SMF ¶ 7; Pl.'s SMF ¶ 7; Def.'s Mot. Summ. J. at Ex. 6.)

In October 2010, Preston complained again to Mattson-Thomas that Book, Rutledge and Wagner were harassing her by moving things on her desk.  (Def.'s SMF ¶ 8; Pl.'s SMF ¶ 8; Def.'s Mot. Summ. J. at Ex. 7.)  Additionally, Preston requested video surveillance of her desk.

2

(*Id.*)  Mattson-Thomas interviewed Book, Rutledge and Wagner, who all denied doing anything to Preston's work area.  (Def.'s SMF ¶ 8; Pl.'s SMF ¶ 8; Def.'s Mot. Summ. J. at Ex. 24.)  Mattson-Thomas also requested video surveillance from Vanguard's security department.  (*Id.*)  On December 31, 2010, Joe Orff ("Orff") installed video surveillance of Preston's desk.  (Def.'s SMF ¶ 9; Pl.'s SMF ¶ 9; Def.'s Mot. Summ. J. at Ex. 8.)  After approximately one month of surveillance, the only people depicted in the video moving things on Preston's desk were housekeepers who dusted and cleaned the office at night.  (Def.'s SMF ¶ 9; Pl.'s SMF ¶ 9; Def.'s Mot. Summ. J. at Exs. 8, 9.)  There was no evidence of Book, Rutledge, Wagner or anyone else doing anything to Preston's work area.  (*Id.*)

Preston filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC") in July 2011 ("First Charge") claiming harassment based on race, age, and religion.  (Def.'s SMF ¶ 10; Pl.'s SMF ¶ 10; Def.'s Mot. Summ. J. at Ex. 18.)  On October 21, 2011, Preston executed a Settlement Agreement ("Settlement Agreement") releasing Vanguard from all claims to date.[1]  (Def.'s SMF ¶ 10; Pl.'s SMF ¶ 10; Def.'s Mot. Summ. J., at Ex. 29; Preston Dep. 188:20–189:7.)  Pursuant to the Settlement Agreement, Vanguard agreed to provide Preston with a locking bin above her desk and renew video surveillance for an additional two weeks, which Vanguard did.  (Def.'s SMF ¶ 10; Pl.'s SMF ¶ 10; Def.'s Mot. Summ. J. at Ex. 29; Preston Dep. 189:11–190:8; 193:5–196:6.)

---

[1]     Vanguard asserts that the Settlement Agreement bars all claims relating to events occurring before October 21, 2011.  (Def.'s Mot. Summ. J. at 12.)  However, at oral argument counsel for both parties agreed that the Court need not consider the Settlement Agreement in order to rule on Vanguard's motion.  (Oral Argument Transcript ("Oral Arg.") at 51:13–53:23.)

    Additionally, Vanguard's motion argues: (1) that all Preston's Title VII and ADEA claims based on pre-November 3, 2011 events are time-barred; and (2) that Preston's PHRA claims based on pre-March 2, 2012 events are time-barred.  (Def.'s Mot. Summ. J. at 12.)  Counsel for both parties also agreed that the Court need not address this argument for purposes of analyzing Vanguard's motion.  (Oral Arg. 55:6–56:5.)

In February 2012, Preston contacted Jennifer Bailey ("Bailey"), the acting Crew Relations Specialist assigned to Preston's group, complaining again that Book, Rutledge and Wagner were tampering with her personal items.  (Def.'s SMF ¶ 11; Pl.'s SMF ¶ 11; Def.'s Mot. Summ. J. at Ex. 10; Bailey Dep. 25:14–24; 27:10–22; 32:2–10.)  Specifically, Preston complained that she saw a speck on her phone which she believed to be solution based (*Id*.)  Bailey recommended that Preston unplug her phone and lock it up in the overhead storage bin that was installed for her.  (Def.'s Mot. Summ. J. at Ex. 10.)  On May 2, 2012, Preston emailed Bailey that the harassment had persisted.  (Def.'s SMF ¶ 12; Pl.'s SMF ¶ 12; Def.'s Mot. Summ. J. at Ex. 11.)  Bailey met with Preston the next day, and reminded her of the resources Vanguard had made available to her so she could achieve peace of mind.  (*Id*.)

Preston's next complaint was on August 29, 2012, when she filed a second EEOC charge for race and age based retaliation ("Second Charge").  (Def.'s SMF ¶ 13; Pl.'s SMF ¶ 13; Bailey Dep. at 43:17–45:6; Def.'s Mot. Summ. J. at Ex. 28.)  Bailey conducted another investigation which she memorialized in an email sent on January 31, 2013.  (Def.'s SMF ¶ 13; Pl.'s SMF ¶ 13; Def.'s Mot. Summ. J. at Ex. 22.)  In the email, Bailey noted that Vanguard provided video surveillance on Preston's desk from November 9, 2012 to January 23, 2013.  (*Id*.)  Although there was at least one occasion where a power outage stopped the video from recording, the surveillance revealed that at no time were Book, Wagner or Rutledge at or near Preston's workstation.  (*Id*.; *see also* Def.'s Mot. Summ. J. at Ex. 17.)

At Preston's request, Bailey also interviewed Kim Dundas ("Dundas"), an employee Preston said may have knowledge as to whether anyone had been sitting at her work station. (*Id*.)  According to Bailey, Dundas said she had never seen anyone sitting at Preston's desk or touching anything in her workstation.  (*Id*.)  As a result of the investigation, Bailey was unable to

conclude that any harassment, discrimination or retaliation had occurred.  (*Id.*)  More specifically, Bailey found nothing to support Preston's claims that either Book, Wagner or Rutledge were harassing her.  (*Id.*)  Additionally, Preston admits she never saw anyone moving, altering or placing anything on her desk.  (Def.'s SMF ¶ 14; Pl.'s SMF ¶ 14; Preston Dep. 87:7–22; 95:4–15; 103:9–104:4; 119:18–120:6; 126:2–12; 146:3–16; 150:12–151:4; 158:4–15; 162:19–163:8; 182:18–22.)

Preston also contends that after voicing her complaints, Vanguard isolated and excluded her.  (Def.'s SMF ¶ 15; Pl.'s SMF ¶ 15.)  Specifically, Preston alleges: (1) that her co-workers and supervisors refused to communicate effectively with her; (2) that her co-workers and supervisors failed to include her in meetings and work discussions; (3) that Hamill told Preston to give her ideas to Wagner; (4) that Book and Wagner moved retail folders for the 2012 sample plan from Preston's electronic database; and (5) that Book once locked Preston out of an excel database.  (Def.'s SMF ¶ 15; Pl.'s SMF ¶ 15; Am. Compl. ¶¶ 39–41, 43–51.)

Preston acknowledged in her deposition testimony however that she was included in team meetings.  (Preston Dep. 236:24–237:2.)  The meetings Preston was allegedly left out of were meetings where a subset of the team would get together.  (*Id.* at 236:5–14.)  Rutledge was also left out of these smaller meetings "most of the time."  (*Id.* at 236:15–20.)  Additionally, Preston confronted Book about the excel database problem.  (*Id.* 246:17–247:4.)  Book responded by saying "I don't know how it's happening."  (*Id.*)  Preston also blames Wagner for the lockout because "Wagner was the data person."  (*Id.* at 248:23–249:3.)  Ultimately, the IT department was called and could not explain what happened.  (*Id.* at 248:16–22.)  After two days of recovery work, the files were restored.  (*Id.* at 251:11–23.)

Beginning in 2010, Preston was told that she was making too many mistakes with her work.  (Def.'s SMF ¶ 19; Pl.'s SMF ¶ 19; Preston Dep. 334:20–335:4.)  In her 2010 year end appraisal, Fisher gave Preston a "further development needed" ("FDN") rating.  (Def.'s SMF ¶ 19; Pl.'s SMF ¶ 19; Def.'s Mot. Summ. J. at Ex. 1; Fisher Dep. 22:18–23:14.)  The 2010 appraisal noted that "[w]hile you handled most of your tasks efficiently and with accuracy, you made some mistakes this year causing re-work.  These mistakes included occasional oversight with lead assignment and content errors with email communication."  (Def.'s SMF ¶ 20; Pl.'s SMF ¶ 20; Def.'s Mot. Summ. J. at Ex. 1.)

Fisher believed that Preston's declining performance stemmed from a lack of attention to detail, and that sales representatives lost confidence in Preston's ability to accurately assist them with their needs.  (Fisher Dep. 11:19–9; 11:20–12:4.)  Preston filed a rebuttal to her 2010 year end appraisal.  (Def.'s Mot. Summ. J. at Ex. 1.)  In the rebuttal, Preston stated:

> My treatment has been bias [sic] and it continues to be.  Each day I walk into a hostile environment and am expected to produce.  As I continue to document negative actions and treatment from two counterparts who apparently feel that they can do as they well please to me and have the protection of VGI's authority [sic].  It is my belief that the fact that I brought some issues to my managers [sic] attention about bias issues led to their decision.  However, It [sic] is interesting that VGI teaches Diversity, but it did not seem to apply to me.

(*Id*.)  Preston met with Fisher on March 11, 2011 to discuss the 2010 rebuttal.  (*Id*.)  However, no changes were made.  (*Id*.)  On Preston's 2011 year end appraisal, Hamill rated her as FDN.  (Def.'s SMF ¶ 22; Pl.'s SMF ¶ 22; Def.'s Mot. Summ. J. at Ex. 2; Preston Dep. 335:12–337:22.)  The 2011 appraisal stated, among other things, "[y]our emails and occasional lead assignments contained errors that could put our reputation with our clients at risk."  (Def.'s SMF ¶ 22; Pl.'s SMF ¶ 22; Def.'s Mot. Summ. J. at Ex. 2.)

On Preston's 2012 year end appraisal, Suzanne Hartson ("Hartson") rated her as FDN. (Def.'s SMF ¶ 23; Pl.'s SMF ¶ 23; Def.'s Mot. Summ. J. at Ex. 3; Preston Dep. 342:2–11.)  The 2012 appraisal stated that "[t]here were at times more errors than expected considering the simplicity of these mailings and for someone with your tenure in the role."  (Def.'s SMF ¶ 23; Pl.'s SMF ¶ 23; Def.'s Mot. Summ. J. at Ex. 3.)  The appraisal also noted that "[y]our written communications continue to have grammatical errors."  (*Id.*)

Vanguard's Deficient Performance Policy provides that an employee would sequentially receive an Oral Warning, a Written Alert and a Formal Warning before termination.  (Def.'s SMF ¶ 24; Pl.'s SMF ¶ 24; Def.'s Mot. Summ. J. at Ex. 26; Fisher Dep. 75:19–77:14; Bailey Dep. 63:1–16.)  Preston received her Oral Warning in February of 2013.  (Def.'s SMF ¶ 25; Pl.'s SMF ¶ 25; Bailey Dep. 82:18–83:2.)  On March 8, 2013, Hartson gave Preston a Written Alert for performance.  (Def.'s SMF ¶ 25; Pl.'s SMF ¶ 25; Def.'s Mot. Summ. J. at Ex. 30; Preston Dep. 349:21–350:6.)  The Written Alert stated:

> Over the last few months you have continued to use incorrect grammar, spelling or verb tenses that make it difficult for the user to easily understand your emails . . . . The outgoing correspondence you create continues to have errors.  These errors are client facing and have the potential to impact the growth and overall reputation of AMS.

(Def.'s SMF ¶ 25; Pl.'s SMF ¶ 25; Def.'s Mot. Summ. J. at Ex. 30.)  Preston continued to make errors after her Written Alert.  (Def.'s SMF ¶ 26; Pl.'s SMF ¶ 26; Preston Dep. 365:4–18.)

On June 17, 2013, Preston's new supervisor Michael Pysher ("Pysher") gave her a Formal Warning for performance.  (Def.'s SMF ¶ 26; Pl.'s SMF ¶ 26; Def.'s Mot. Summ. J. at Ex. 20; Preston Dep. 363:20–364:4.)  The Formal Warning stated that "[d]uring the Written Alert period you have continued to make frequent typographical errors resulting in unclear

communication or have sent emails to the wrong individual." (Def.'s SMF ¶ 26; Pl.'s SMF ¶ 26; Def.'s Mot. Summ. J. at Ex. 20.) In Preston's 2013 midyear update, Pysher noted "the following areas are off course: . . . [i]mprove clarity and reduce errors of written communication . . . take time to ensure that your emails are sent to your intended recipient . . . strive for no errors on Sales Marketing Kits . . . review policies and procedures to ensure compliance." (Def.'s SMF ¶ 27; Pl.'s SMF ¶ 27; Def.'s Mot. Summ. J. at Ex. 25.)

On August 23, 2013, Pysher advised Preston that she had not closed her performance gaps. (Def.'s SMF ¶ 28; Pl.'s SMF ¶ 28; Def.'s Mot. Summ. J. at Ex. 14.) Pysher also asked Preston if she would consider retiring instead of being terminated. (Def.'s SMF ¶ 28; Pl.'s SMF ¶ 28; Def.'s Mot. Summ. J. at Ex. 14.) On September 5, 2013, Preston told Pysher that she would retire in lieu of being terminated. (Def.'s SMF ¶ 30; Pl.'s SMF ¶ 30; Def.'s Mot. Summ. J. at Ex. 16; Preston Dep. 366:9–13.) Pysher told Preston that the reason she would have been terminated was that she was making too many errors.[2] (Def.'s SMF ¶ 30; Pl.'s SMF ¶ 30; Preston Dep. 325:6–326:21; 368:6–369:17.)

Throughout her time at Vanguard, Preston never heard anyone say anything negative about her race. (Preston Dep. 268:8–13.) However, Preston believes that five Vanguard employees are racist: Book, Wagner, Tim Doyle ("Doyle"), Bob Frankenfield ("Frankenfield"), Andy Hallmark ("Hallmark"), and Chris Carr ("Carr"). (*Id*. at 268:14–269:15.) Preston considers these people to be racist because of actions they took which she believed to be racially motivated. (*Id*. at 270:4–279:5.) Preston believes that Doyle is racist because he said she could leave if she did not like the way she was being treated. (*Id*. at 270:4–9.) Preston believes Book

---

[2] Although Preston technically resigned, Vanguard does not contest Preston's contention that she was "constructively discharged," and therefore terminated. (Oral Arg. 44:3–22.)

and Wagner are racist because she assumes that their general treatment of her was because of her race.  (*Id*. at 270:10–271:7.)  Preston believes Frankenfield, Carr and Hallmark are racist because they preferred to work with others.  (*Id*. at 271:8–279:5.)  Preston admits that no one ever said that criticisms of her or her termination were based on her race.  (*Id*. at 283:24–284:3.)

Additionally, Preston never heard anyone say anything negative regarding her age.  (*Id*. at 264:24–265:9; 267:16–23.)  Book and Wagner never said anything directly or indirectly regarding Preston's age.  (*Id*. at 256:11–257:20; 262:4–17; 263:4–24.)  Preston has adduced no support for her belief that Book and Wagner's treatment of her was based on her age.  (*Id*. at 263:4–264:20.)  Moreover, Fisher never said that he favored younger employees.  (*Id*. at 292:24–293:21.)  No one at Vanguard ever said that any criticisms of Preston or her termination were based on her age.  (*Id*. at 326:22–327:5.)

Preston filed her original complaint on December 22, 2014.  (ECF No. 1.)  After Vanguard filed a motion to dismiss (ECF No. 6.), Preston filed her first amended complaint on March 24, 2015 (ECF No. 9.), alleging: (1) hostile work environment under Title VII and the PHRA (Counts I and II); (2) retaliation for complaints of harassment under Title VII, the ADEA, and the PHRA (Counts III, VI, and VII); (3) termination under § 1981 (Count VIII); and (4) retaliation for race based wage complaints under § 1981 (Count IX).[3]

The Court entered a Scheduling Order on May 13, 2015, which set a discovery deadline of August 14, 2015.  (ECF No. 16.)  At Preston's request, the Court amended its original Scheduling Order and granted Preston a two week extension to conduct discovery.  (ECF No.

---

[3]      Preston also included claims for age discrimination under the ADEA and PHRA (Counts IV and V).  In her response to Vanguard's motion for summary judgment, Preston abandoned these claims.  (Plaintiff's Amended Response to Defendant's Motion for Summary Judgment ("Pl.'s Am. Resp.") at 1, ECF No. 27.)  Additionally, Preston abandoned the portions of Counts VIII and IX pertaining to wage disparity.  (*Id*.)

22.)  According to the Court's Amended Scheduling Order, motions for summary judgment were to be filed by September 30, 2015, and any responses by October 9, 2015.  (*Id*.)  Vanguard filed its motion for summary judgment on September 30, 2015.  (ECF No. 24.)  The day Preston's response was due, she requested a one week extension.  (ECF No. 25.)  The Court granted Preston's request and ordered that she file her response to Vanguard's motion by October 16 (*Id*.), which she did.  (ECF No. 26.)

Preston then filed an amended response on October 19, 2015 (ECF No. 27.)  Vanguard filed its reply on October 23, 2015.  (ECF No. 30.)  Vanguard's reply refuted allegations in Preston's response which seemed to raise a new theory of an adverse action—namely that she suffered from increased criticisms of her work which led to her termination.  (Def.'s Reply in Support of Motion for Summary Judgment ("Def.'s Reply") at 5, ECF No 30.)  Additionally, Vanguard argued that Preston never pleaded this theory, and should therefore not be allowed to amend.  (*Id*.)  Three days later—after Vanguard's motion for summary judgment had been fully briefed and fifty-nine days after the close of discovery—Preston filed a motion for leave to file a second amended complaint.  (ECF No. 31.)  Preston's proposed amendments sought to add an additional adverse action—namely that she suffered from increased criticisms of her work which led to her termination.  (Plaintiff's Motion for Leave to Amend ("Pl.'s Mot. Am.") at Ex. 2, ECF No. 31.)  Vanguard filed its response to Preston's motion on November 10, 2015.  (ECF No. 34.)  On November 17, 2015, the Court heard oral argument on Vanguard's motion for summary judgment and Preston's motion for leave to file an amended complaint.

## II.

Under Federal Rule of Civil Procedure 15(a), "courts may grant . . . amendments 'when justice so requires.'" *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (citing Fed. R. Civ. P. 15(a)).  While Rule 15 states that "leave to amend should be 'freely given,' a district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party."  *Id.*; *see also Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (citing *Foman v. Davis*, 371 U.S. 178 (1962)).  "When a party fails to take advantage of previous opportunities to amend, without adequate explanation, leave to amend is properly denied." *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006).

Generally, "[d]elay alone is not sufficient to justify denial of leave to amend."  *Id.* (referencing *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)).  However, "at some point, the delay will become 'undue,' placing an unwarranted burden on the court, or will become 'prejudicial,' placing an unfair burden on the opposing party."  *Adams*, 739 F.2d at 868; *see also Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001).  Thus, "the question of undue delay requires that we focus on the movant's reasons for not amending sooner."  *Cureton*, 252 F.3d at 273 (referencing *Adams*, 739 F.2d at 868).

Preston contends that she should be granted leave to conform the pleadings to facts discovered through the course of discovery.  (Plaintiff's Motion for Leave to Amend ("Pl.'s Mot. Am.") at 3, ECF No. 31.)  However, at oral argument counsel for Preston was asked why he needed fifty-nine days after the discovery deadline to file a motion for leave to amend "when the

proposed amendments are allegedly being proffered as a result of facts learned in discovery."
(Oral Arg. at 5:4–10.)  His answer, among other things, was that "[t]he proposed amendment is
simply to add . . . an adverse employment action, frankly in response to the summary judgment
argument made by [Vanguard's counsel]."  (*Id*. at 9:16–19.)  Filing a motion for leave to amend
after summary judgment has been fully briefed for the sole purpose of defeating summary
judgment is not the type of "adequate explanation," (*Arthur*, 434 F.3d at 204), or "reason[] for
not amending sooner" (*Cureton*, 252 F.3d at 273) that justifies granting leave.  *See*, *e.g.*,
*Whitman v. Proconex, Inc.*, No. 08–cv–2667, 2009 WL 113740, at *3 (E.D. Pa. Jan. 14, 2009)
(denying leave to amend where plaintiff filed her motion two months after the discovery deadline
and after summary judgment had been fully briefed).  In any event, Preston's proposed
amendments are futile.[4]

Generally, "[t]he futility analysis on a motion to amend is essentially the same as a Rule
12(b)(6) motion."  *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 229 (E.D. Pa. 2012).  However,
"where plaintiff files a motion to amend after defendant has moved for summary judgment the
motion to amend will not be granted unless the party seeking amendment can show not only that
the proposed amendment has 'substantial merit,' but also come forward with 'substantial and
convincing evidence' supporting the newly asserted claim."  *Carey v. Beans*, 500 F. Supp. 580,
582 (E.D. Pa. 1980) *aff'd*, 659 F.2d 1065 (3d Cir. 1981) (citing *Verhein v. South Bend Lathe,
Inc.*, 598 F.2d 1061, 1063 (7th Cir. 1979)).  Preston's proposed amendments fail to satisfy either
standard.  *See infra*, Part V.  Accordingly, Preston's motion for leave to amend is denied.

---

[4]     At oral argument, counsel for both parties presented their arguments with respect to Vanguard's motion for
summary judgment as if leave to amend had been granted.  The arguments made confirmed the futility of Preston's
proposed amendments.

## III.

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## IV.

Counts I and II of Preston's first amended complaint allege claims of a hostile work environment under Title VII and the PHRA.  Specifically, Preston contends that her co-workers engaged in racially motivated harassment by moving items on her desk and around her work station.  Title VII provides that, "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment,

13

because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  "Claims arising under the PHRA are governed by the same legal standard as that applied to Title VII."  *Lepore v. Lanvision Sys., Inc.*, 113 F. App'x 449, 452 (3d Cir. 2004).  The Court's conclusions as to Preston's Title VII claim will therefore apply equally to her PHRA claim.

Title VII "prohibits [racial] harassment that is 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  To succeed on a hostile work environment claim, Preston must establish: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability."  *Id.*; *see also Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).  The second, third and fourth elements "coalesce into a single inquiry: did the plaintiff suffer retaliatory harassment severe or pervasive enough to 'alter the conditions of [her] employment and create an abusive working environment?'"  *Jensen*, 435 F.3d at 451 (citing *Meritor*, 477 U.S. at 67).

Preston must first establish that she suffered intentional discrimination *because of her race* (emphasis added).  "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at discrimination because of [race]."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal citations omitted).  Indeed, Title VII was never meant to be "a general civility code for the American workplace."  *Oncale*, 523 U.S. at

14

80–81.  Preston contends that Book, Rutledge and Wagner moved things on her desk.  (Def.'s

SMF ¶ 5; Pl.'s SMF ¶ 5.)  Preston considers Book and Wagner to be racist.  (Preston Dep.

270:10–271:7.)  As an initial matter, there is no evidence in the record showing that anyone

(other than perhaps the occasional cleaning crew) ever moved anything on Preston's desk.

(Def.'s SMF ¶¶ 8–9, 13–14; Pl.'s SMF ¶¶ 8–9, 13–14; Def.'s Mot. Summ. J. at Exs. 8–9, 17, 22,

24.)  Moreover, aside from Preston's own subjective belief that she was being harassed because

of her race, there is no record evidence that anyone at Vanguard engaged in racially motivated

harassment.  Indeed, Preston admits that she never heard anyone at Vanguard say anything

negative about her race.[5]  (Preston Dep. 268:8–13.)  Additionally, Vanguard investigated

Preston's complaints, interviewed those allegedly involved, and even provided Preston with

video surveillance of her desk on more than one occasion.  (Def.'s SMF ¶¶ 8, 9; Pl.'s SMF ¶¶ 8,

9; Def.'s Mot. Summ. J. at Exs. 8, 24.)  Nothing in the record even remotely suggests that

anyone saw, heard or said anything that a reasonable juror could attribute to racially motivated

harassment.

        Preston also fails to show that the alleged harassment was severe or pervasive.  A severe

or pervasive work environment "'alters the conditions of the victim's employment' and creates

an 'abusive working environment.'"  *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d

Cir. 2014) (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270 (2001)).  The

environment "must be objectively hostile, not just hostile in the plaintiff's view."  *Id*.  Whether a

workplace is sufficiently hostile "is determined by considering the totality of the circumstances,

including the 'frequency of the conduct; its severity, and whether it is physically threatening or

---

[5]        Preston alleges in her response brief that "Fisher made racially insensitive, derogatory, and racist comments
to her."  (Pl.'s Am. Resp. at 30.)  There is no evidence in the record however of Fisher making any racist comments
to Preston and, in any event, Preston's accusation in her response brief flatly contradicts her own sworn deposition
testimony where she stated she never heard anyone say anything negative about her race.  (Preston Dep. 268:8–13.)

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (citing *Breeden*, 532 U.S. at 271 (quotation marks and internal citations omitted)).

While Preston may contend that the alleged discrimination detrimentally affected her, her subjective belief that she was enduring a hostile work environment, absent even a scintilla of record evidence to support or corroborate that belief, is obviously not enough. *Jensen*, 435 F.3d at 451.  She must show "an objectively hostile work environment." *Id.*  "Occasional insults, teasing, or episodic instances of ridicule are not enough; they do not 'permeate' the workplace and change the very nature of the plaintiff's employment.'" *Id.* (referencing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).  The harassment Preston alleges does not rise to the level of "permeat[ing] the workplace" or "alter[ing] the conditions of [her] employment." *Jensen*, 435 F.3d at 451; *Greer*, 590 F. App'x at 173.  Allegedly having items shifted around her work station does not "unreasonably interfere[] with [Preston's] work performance." *Greer*, 590 F. App'x at 173 (citing *Breeden*, 532 U.S. at 270).

Finally, Preston fails to show that Vanguard is liable under a theory of *respondeat superior*.  Liability for co-worker harassment "exists only if [Vanguard] failed to provide a reasonable avenue for complaint or, alternatively, if [Vanguard] knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).  Vanguard responded to all of Preston's complaints.  Its Crew Relations Team conducted interviews and even gave Preston video surveillance of her desk on more than one occasion.  (Def.'s SMF ¶ 8; Pl.'s SMF ¶ 8; Def.'s Mot. Summ. J. at Ex. 24.)  Moreover, Vanguard could not "know" of any harassment when no evidence of harassment existed.  Indeed, the video footage never showed anyone

moving things on her desk, and Preston admits she never saw anyone moving things on her desk. (Def.'s SMF ¶ 14; Pl.'s SMF ¶ 14; Preston Dep. 87:7–22; 95:4–15; 103:9–104:4; 119:18–120:6; 126:2–12; 146:3–16; 150:12–151:4; 158:4–15; 162:19–163:8; 182:18–22.)  Preston therefore fails to establish a claim for a hostile work environment under Title VII and the PHRA.[6]

## V.

Counts III, VI and VII of Preston's first amended complaint allege claims for retaliation under Title VII, the ADEA, and the PHRA.  Preston contends that after first complaining of race and age based harassment in May 2010, she was subjected to ongoing harassment and isolation. Preston also contends that she suffered ongoing harassment and isolation after she filed her First and Second Charges with the EEOC.

In the absence of direct evidence of retaliation,[7] Title VII retaliation claims are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[8]  To establish a *prima facie* case of retaliation, Preston must show: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995).  If Preston establishes her *prima*

---

[6]    At oral argument, Preston's counsel was asked: "[A]re you acknowledging that it's difficult on this record for you to fulfill the elements of the hostile work environment claim?"  (Oral Arg. 65:24–66:1.)  Counsel's response was "I am. And, actually, I only have a brief point to make about the hostile work environment [claim]."  (*Id.* at 66:2–4.)  Counsel then discussed a line of questioning during Fisher's deposition where Fisher was asked if he made any derogatory comments to Preston.  (*Id.* at 66:20–67:14.)  Counsel admitted that Fisher denied making any such statements.  (*Id.*)  He then said: "[M]y only point with the hostile work environment claim was . . . I wasn't expecting Mr. Fisher to tell me that he made [derogatory] comments . . . I'm basically presenting [this] to the Court so that the Court can take that into consideration to realize that . . . it's not a non-colorable claim.  (*Id.* at 68:6–13.)

[7]    *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005).

[8]    PHRA claims are analyzed the same as Title VII claims.  *See supra* Part IV.  Additionally, Preston's ADEA claim is analyzed under the same framework.  *See, e.g.*, *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002) (referencing *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)) ("Because the anti-retaliation provisions of the ADA and ADEA are nearly identical, as is the anti-retaliation provision of Title VII, we have held that precedent interpreting any one of these statutes is equally relevant to interpretation of the others.").

17

*facie* case, "'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (citing *Krouse*, 126 F.3d at 500–01).

Preston must first show that she was engaged in a protected activity.  For Preston's complaints to constitute protected activity, she must have "[held] an objectively reasonable belief, in good faith, that the activity [she] oppose[d] [was] unlawful." *Id*. at 341.  Vanguard does not contest that Preston made her complaints in good faith.  (Oral Arg. 33:20–25.)  Vanguard does contend however that Preston's complaints were not objectively reasonable.

The Court agrees that Preston fails to show that her complaints of race and age based harassment were objectively reasonable.  There is no record evidence that Preston heard anyone at Vanguard ever say anything negative to her about her race or age.  (Preston Dep. 264:24–265:9; 267:16–23; 268:8–13.).  Moreover, the type of harassment Preston complained of cannot objectively be seen as motivated by race or age.  The only evidence of harassment in the record is that Preston believed items were being moved around on her desk; she then assumes that this was occurring because of her race.  (Preston Dep. 270:10–271:7.)  However, as discussed above,[9] Preston's subjective belief is not enough.  *Jensen*, 435 F.3d at 451.  Accordingly, Preston fails to establish that she engaged in a protected activity.

Even if Preston could show a protected activity, she fails to establish that she suffered an adverse action.  In order to establish adverse action, Preston must show that the action taken by

---

[9]     *See supra* Part IV.

Vanguard was "materially adverse" such that it might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 54.  Preston's contentions that she suffered from ongoing harassment and isolation are not enough.[10]  First, there is no evidence that any harassment actually occurred.  Even if it had occurred, Preston would still have to establish that Vanguard could be held liable for the conduct of Preston's co-workers—which she cannot.  *See supra* Part IV.  Second, Preston alleges that she was isolated by her co-workers who went to lunch without her and did not invite her to all meetings.  However, "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Jensen*, 435 F.3d at 452 (citing *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000)).  Moreover, Preston's allegations that she was excluded from meetings, "told to give her ideas to Wagner," and once locked out of a shared excel database do not constitute "materially adverse" actions that would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 54 (2006).[11]

Even if Preston could establish that she suffered from an adverse action, she still fails to show that there was a causal connection between her participation in the protected activity and the adverse employment action.  Preston may rely on a "broad array of evidence to demonstrate a causal link between [her] protected activity and the adverse action taken against [her]." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007), *as amended* (Aug. 28, 2007).  "In certain narrow circumstances, an 'unusually suggestive' proximity in time between the protected

---

[10]     Preston's proposed amendments seek to add allegations that she suffered from poor performance evaluations which eventually led to her termination.  (Pl.'s Mot. Am. at Ex. 2.)  Because Preston cannot establish a protected activity, these amendments would be futile.  Moreover, negative performance evaluations, without more, do not constitute adverse actions. *See, e.g.*, *Weston v. Pennsylvania*, 251 F.3d 420, 431 (3d Cir. 2001) *overruled in part on other grounds by Burlington*, 548 U.S. 53; *Raffaele v. Potter*, No. 09–cv–3622, 2012 WL 33035, at *4 (E.D. Pa. Jan. 6, 2012).

[11]     Again, Preston admits that she was included in team meetings, and that Rutledge was left out of smaller group meetings "most of the time." *See supra* Part I.  Additionally, Vanguard's IT department could not initially identify why Preston was not able to access the excel database. *Id.*

activity and the adverse action may be sufficient, on its own, to establish the requisite causal

connection." *Id.*  (referencing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding

discharge of plaintiff two days after filing EEOC complaint to be sufficient, under the

circumstances, to establish causation)).  Courts may also look to the intervening period between

complaints to determine whether or not there is a pattern of antagonism that could establish

causation. *Id*.

Preston cannot establish that the time between her complaints and any ongoing

harassment or isolation was "unusually suggestive."[12]  Indeed, the record shows that Preston's

complaints spanned the course of three years, within which months would pass before she raised

any new complaints. *See supra* Part I (May 2010–October 2010; October 2010–July of 2011;

October 2011–February 2012; February 2012–August 2012).  Preston also fails to establish

causation by showing a pattern of antagonism. *See, e.g.*, *Woodson v. Scott Paper Co.*, 109 F.3d

913, 921 (3d Cir. 1997) (finding pattern where: employer set plaintiff up for failure by hiring him

to a struggling division and refusing to provide him with adequate resources; employer failed to

respond appropriately to racist graffiti in its plant; and employer's termination of plaintiff was

carried out pursuant to a "sham" ranking process performed by individuals who were not familiar

with his employment record, but only with his charges of discrimination).  Here, Preston has not

shown any objectively reasonable claim of harassment or isolation, much less a pattern of

antagonism that raises an inference of discrimination.[13]

---

[12]    Preston additionally fails to establish that her proposed amendments would change this analysis.  Her
performance reviews were issued every six months.  This is not the type of "unduly suggestive" proximity required
to establish causation.

[13]    Preston claims that the timing of her poor performance reviews—which started after she first complained—
establishes the types of "inconsistent reasons given by the employer" for her termination.  *Marra*, 497 F.3d at 302.
To establish causation through inconsistencies, Preston must "demonstrate such weaknesses, implausibilities,
inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

Thus, Preston fails to make out a *prima facie* case of retaliation under Title VII, the ADEA, and the PHRA.  Moreover, Vanguard has articulated a legitimate non-retaliatory reason for her firing—namely that she was making too many errors.  (Def.'s SMF ¶ 30; Pl.'s SMF ¶ 30; Preston Dep. 325:6–326:21; 368:6–369:17.)  Vanguard's burden is "relatively light" and "is satisfied if [Vanguard] articulates any legitimate reason for [Preston's] discharge."  *Woodson*, 109 F.3d at 920 (citing *Fuentes*, 32 F.3d at 763).  Preston's performance evaluations declined over a period of three years.  *See supra* Part I.  After receiving an Oral Warning, a Written Alert and a Formal Warning, Preston had still not closed the performance gaps identified by four different supervisors over that time period.  Accordingly, Vanguard has articulated a legitimate non-retaliatory reason for Preston's termination.  Additionally, Preston cannot establish pretext for the same reasons she cannot establish a *prima facie* case.

## VI.

Counts VIII and IX of Preston's amended complaint allege violations of 42 U.S.C. § 1981: Count VIII alleges a claim for termination based on race; Count IX alleges a claim for retaliation stemming from race-based wage complaints.  Preston failed to respond to Vanguard's argument for summary judgment on both Counts.  "When a motion for summary judgment is properly made and supported, an opposing party must set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should be granted."

---

reasonable factfinder could rationally find them unworthy of credence."  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted).  Preston has not done so on this record.

Preston contends that Vanguard's reason for her termination—that she was making too many errors—is inconsistent because she never received a poor evaluation until after she had complained.  However, Preston fails to show that a reasonable factfinder could find Vanguard's reason unworthy of credence.  Preston's evaluations continued to decline over a period of three years.  *See supra* Part I.  Moreover, she received negative performance reviews from four different supervisors.  *Id*.  Fisher believed that her declining performance was related to attention to detail, and that sales representatives were losing confidence in her ability to accurately assist them with their needs.  *Id*.  Additionally, Preston's errors were "client facing and had the potential to impact the growth and overall reputation of AMS."  *Id*.  Preston thus fails to show inconsistencies that a reasonable factfinder could find unworthy of credence.

*Nelson v. DeVry, Inc.*, No. 07–cv–4436, 2009 WL 1213640, at *10 (E.D. Pa. Apr. 23, 2009) (citing Fed. R. Civ. P. 56(e)(2)); *see also Jackson v. J. Lewis Crozer Library*, No. 07–cv–0481, 2007 WL 2407102 (E.D. Pa. Aug. 22, 2007).  Given Preston's lack of response, the Court could grant Vanguard's motion as to Preston's § 1981 claims as unopposed.  In any event, Preston's § 1981 claims fail.

<u>*Termination Based on Race – Count VIII*</u>

Termination claims under § 1981 based on indirect evidence of discrimination are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[14]  Thus, to establish a *prima facie* case of race discrimination Preston must establish: (1) that she is a member of a protected class; (2) that she is qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances of her adverse action give rise to an inference of unlawful discrimination.  *Jones v. Sch. Dist. of Philadelphia*, 19 F. Supp. 2d 414, 418 (E.D. Pa. 1998) *aff'd*, 198 F.3d 403 (3d Cir. 1999).  Vanguard does not contest that Preston is a member of a protected class, is qualified for the position, or that she was terminated.[15]  Vanguard contends however that Preston cannot establish circumstances surrounding her termination that give rise to an inference of unlawful discrimination.

"The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race."  *Sarullo v U.S Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).  When considering this prong, the exact nature of what a plaintiff must show "depends on the circumstances of the case."  *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527

---

[14]      "The substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII."  *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009) (referencing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999)).

[15]      Although Preston resigned, counsel for Vanguard

F.3d 358, 365 (3d Cir. 2008), *order clarified*, 543 F.3d 178 (3d Cir. 2008) (citing *Torre v. Casio, Inc.*, 42 F.3d 825, 830 (3d Cir. 1994)).  Facts that "can give rise to a reasonable inference of discrimination include that . . . the plaintiff was replaced by a person outside the protected class." *Distajo v. PNC Bank, N.A.*, No. 09–cv–2712, 2009 WL 3467773, at *3 (E.D. Pa. Oct. 27, 2009) (citing *Sarullo*, 352 F.3d at 798 n.7).

Preston fails to establish an inference of discrimination.  First, she presents no record evidence of discrimination other than her own subjective belief that five people at Vanguard were racist.  *See supra* Part I.  Even if Preston could point to any evidence of racial bias, she still fails to show how that bias affected the decision to terminate her; none of the five people she identifies as racist were her supervisors, or otherwise involved in the termination decision.  Moreover, Preston fails to provide evidence that she was replaced by someone outside her protected class.  Although the *prima facie* burden is typically "not onerous" and "easily met," Preston has failed to establish circumstances giving rise to an inference of discrimination.  *Doe*, 527 F.3d at 365 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  Accordingly, her termination claim under § 1981 fails.

### Retaliation for Race Based Wage Complaints – Count IX

Preston contends that after she complained of non-African American sales support specialists receiving higher raises, Vanguard subjected her to further harassment, isolation and eventually termination.  Retaliation claims brought under § 1981 are analyzed identically to those brought under Title VII.  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010).

Like her Title VII, ADEA and PHRA retaliation claims in *supra* Part V, Preston's § 1981 retaliation claim fails.  Again, to establish a *prima facie* case of retaliation, Preston must establish: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.  *Nelson*, 51 F.3d at 386.

While Preston may have believed in good faith that her complaints had merit, they again fail to meet the objectively reasonable test.  Preston offers no evidence to support her claim that she was being paid less than any comparators.[16]  Indeed, there is nothing in the record—other than Preston's testimony—that any wage complaints were actually made.  Without more, Preston's testimony that she complained about wages is insufficient to establish an objectively reasonable complaint.  Accordingly, her § 1981 retaliation claim fails.

BY THE COURT

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J

---

[16]     Comparators "must be similarly situated in all relevant respects."  *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011).  In 2011, Rutledge received a "fully successful" rating and a 2.445% raise.  Preston received a FDN rating and a .905% raise.  (Def.'s SMF ¶ 32; Pl.'s SMF ¶ 32.)  In 2012 Preston did not receive a raise.  *Id*.  All sales support specialists who received raises in 2012 had ratings of either "distinguished" or "fully successful."  *Id*.  The only sales support specialists that received FDN ratings in 2012 were Wesley Miller ("Miller"), Matthew Pomante ("Pomante") and Preston.  (Def.'s Mot. Summ. J. at Ex. 21.)  Both Preston and Miller received no raise.  *Id*.  Pomante received a raise because he was completing more complex work which resulted from his showing of initiative.  *Id*.